UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **JASON MADISON,** ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | CIVIL ACTION FILE |
| v. ) | NO._____ |
| ) | |
| **ROBERTSON, ANSCHUTZ,** ) | |
| **SCHNEID, CRANE &** ) | |
| **PARTNERS, LLC** ) | |
| **and GEORGIA DEFAULT** ) | |
| **GROUP LLC** ) | **JURY TRIAL DEMANDED** |
| ) | |
| *Defendants*. ) | |

# COMPLAINT

Plaintiff Jason Madison ("Plaintiff") submits the following Complaint for damages under the Americans with Disabilities Act of 1990 ("ADA") as amended against Robertson, Anschutz, Schneid, Crane, Partners LLC ("RAS") and Defendant Georgia Default Group LLC ("GDG") (RAS and GDG collectively, "Defendants").

## JURISDICTION AND VENUE

1. This action is for ADA discrimination and retaliation. Plaintiff seeks declaratory and injunctive relief, backpay, front pay, compensatory damages, punitive damages, liquidated damages, attorney's fees and costs.

2. This Court has jurisdiction over the present matter pursuant to 28 U.S.C. § 1331.

3. Venue is appropriate in this Court as upon information and belief the events complained of herein occurred within the geographic boundaries of the U.S. District Court for the Northern District of Georgia and upon information and belief all parties to this action reside within the geographic boundaries of the United States District Court for the Northern District of Georgia. Venue is proper pursuant to 28 U.S.C. § 1391 (b) and (c).

## PARTIES

4. Plaintiff is a former joint employee of both Defendants.

5. GDG is a foreign limited liability company registered to conduct business in the state of Georgia.

6. GDG may be served through its registered agent if service of process is not waived:

>   Registered Agent Name: **Vcorp Agent Services, Inc.**
>   Physical Address: **289 S Culver Street, Lawrenceville, GA, 30046, USA**
>   County: **Gwinnett**

7. RAS is a foreign limited liability company registered to conduct business in the state of Georgia.

8. RAS may be served through its registered agent if service of process is not waived:

>   Registered Agent Name: Vcorp Agent Services, Inc.
>   Physical Address: 289 S Culver Street, Lawrenceville, GA, 30046, USA
>   County: Gwinnett

9. This Court has personal jurisdiction over both joint Defendant employers.

## ADMINISTRATIVE PROCEEDINGS

10. On March 8, 2024, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") against Defendants.

11. On May 13, 2025, the EEOC issued Plaintiff his notice of right to sue.

12. Plaintiff has exhausted his administrative remedies prerequisite to filing this suit pursuant to the ADA.

13. Suit has been filed within 90 days of Plaintiff's receipt of his notice of right to sue.

## STATEMENT OF FACTS

14. GDG is based in Boca Raton, Florida, and maintains an office in Alpharetta, Georgia.

15. GDG provides administrative support for lenders, mortgage banks, banks, and bank servicers; additionally, they provide administrative, human resources, and benefits administration services to the default services legal industry.

16. During all time relevant to this lawsuit, the Defendant employed more than fifteen (15) employees for each working day during each of twenty (20) or more calendar weeks during Plaintiff's employment.

17. RAS is also based in Boca Raton, Florida, and maintains an office in Alpharetta, Georgia.

18. RAS is a law firm which manages and controls GDG.

19. Plaintiff was jointly employed by Defendants.

20. At all times material to this Complaint, Defendants were joint employers of Plaintiff. In effect, they each had control over Plaintiff's employment and the terms and conditions of his job.

21. Upon information and belief, each Defendant had authority to exercise control over the terms and conditions of Plaintiff's employment, specifically but not limited to job assignments, hours, pay, benefits, promotional opportunities, and each had the ability to hire and fire.

22. Defendants are a highly integrated entity where employees are often unaware of the distinction between the two entities, and employees of GDG may be managed by employees of RAS.

23. GDG and RAS employees meet the definition of the "single employer test" under *Lyes v. City of Riviera Beach*, 166 F.3d 1332, 1341 (11th Cir. 1999).

24. Alternatively, the Defendants contract with each other for the performance of some tasks, and RAS retains sufficient control over the terms and conditions of Plaintiff's employment such that they are "joint employers." See *Virgo v. Riviera Beach Assocs., Ltd.,* 30 F.3d 1350, 1359-60 (11th Cir. 1994).

25. Alternatively, GDG has delegated sufficient control of some traditional rights over its employees to a RAS such that RAS may be considered an agent of GDG. This is called the "agency test." See *Lyes*, 166 F.3d at 1341.

26. Defendants are entities covered by the ADA.

27. Plaintiff worked for Defendants from March 21, 2022, through November 18, 2022, as a legal assistant.

28. Plaintiff was rehired on August 21, 2023, as a legal assistant.

29. Plaintiff was clearly qualified for his position.

30. Plaintiff has diabetes, a disease covered by the ADA.

31. Immediately upon rehire, Plaintiff spoke with Jordan Bush ("Ms. Bush"), an HR Representative from RAS, about reasonable accommodations for his disability; namely, Plaintiff requested that he be able to work from home on days when his diabetes flared up.

32. Ms. Bush responded on behalf of RAS that they would "get on it."

33. Plaintiff's request to work from home on those days was motivated by the fact that he could better manage his condition at home than in the office, making him more productive working from home on those days.

34. For example, when his disability was flared up, he needed frequent access to the restroom, which was easier to manage at home.

35. Plaintiff also had easier access to nutrition needed when his blood sugar was outside of the normal range.

36. Additionally, Plaintiff had significant difficulty driving on days where his disability flared up, and working from home alleviated that problem entirely.

37. Further, during his first stint of employment with Defendants, Plaintiff was allowed to work from home and had done so successfully.

38. Because of his previous employment, Plaintiff, at the very least, knew the basics of his position and Defendants' processes and systems and was well aware that there were no essential functions of his job that required him to be in office.

39. On or about August 22. 2023, Plaintiff sent Ms. Bush a copy of the doctor's note that was previously on file with Defendant.

40. Plaintiff was finally emailed an ADA accommodation form on or about September 26, 2023.

41. Plaintiff returned the form on or about October 13, 2023, after completing it with his physician.

42. Nevertheless, Plaintiff was told by Meghan Hankey ("Ms. Hankey") HR Director of RAS, that he could not have any absences from work and that working from home was not a reasonable accommodation, despite the fact that other non-disabled, similarly situated employees were allowed to work from home.

43. Plaintiff often faced harassment when he was in the office on days when his diabetes flared up, having to answer to his whereabouts when he had to take frequent restroom breaks and being accused of not being productive.

44. In fact, On or about October 11, 2023, Plaintiff's supervisor, Victor Igori ("Mr. Igori") complained that he was away from his desk while he was, in fact, in the restroom, leading to a verbal warning for Plaintiff.

45. This complaint occurred even though during in-person progress meetings with Mr. Igori, Plaintiff's productivity being "unacceptable" was never communicated; rather, Mr. Igori applied the "meets expectations" criteria repeatedly.

46. On or about October 24, 2023, Plaintiff received an email from Rachel Croce ("Ms. Croce") the Bankruptcy Manager, that he failed to advise management of his absences, which was not the case.

47. He was also told that he was causing an undue burden on his team and the organization, making him feel ostracized, singled out, and harassed.

48. When Plaintiff was unable to make it to the office, he did text and/or call the appropriate people to the best of his ability despite being exhausted, weak, having blurred vision, and vomiting.

49. Plaintiff was then called into a meeting with Ms. Croce and Amanda Taylor ("Ms. Taylor"), Bankruptcy Director, to discuss his absences and the fact that he was not allowed to work remotely.

50. Plaintiff reiterated during that meeting that allowing him to work remotely on necessary days would improve his productivity and absence record since he would be better able to manage his symptoms at home.

51. In response, Plaintiff was told that any further absences, whether or not excused by a doctor's note, would result in further disciplinary action, up to and including termination.

52. On or about November 11, 2023, Plaintiff was called into a meeting with Ms. Croce and an attorney generally present when employees were terminated.

53. Plaintiff was then terminated by Ms. Croce and Ms. Hankey, who made several statements that violated the ADA.

54. For example, Ms. Hankey. stated that attendance during the training period is "really mandatory and the time you were away unfortunately impacted that," even though Plaintiff was away for reasons directly related to his disability.

55. This is a direct admission that Plaintiff was terminated because of time missed due to his disability.

56. Plaintiff again attempted to explain to Defendant that the reasonable accommodation he was requesting would have largely eliminated the reasons he was being given for his termination.

57. In fact, Defendant never engaged in the interactive process for determining reasonable accommodations, instead denying Plaintiff's request outright on more than one occasion, despite Plaintiff's ability to complete the essential functions of his position remotely.

58. In fact, the 90-day training period given to Plaintiff was arbitrary since he was not actively in training throughout the duration of that period.

59. By Defendant's own admission in their Position Statement to the EEOC, the 90-day training period exists so that employees "have immediate access to trainer to walk through processes and obtain immediate help" (*See* Exhibit 1); however, there are not necessarily specific training activities taking place each day during that period.

60. All employees are eligible to work from home after the 90-day training period, so offering that to Plaintiff *after* his 90-day training was not a reasonable accommodation offered as a result of his disability.

61. Accommodating Plaintiff, instead, would entail working with him to create an environment where he could both manage his disability as well as his workplace responsibilities in a manner distinct from those without a disability.

62. For these reasons, Plaintiff felt that the reason he was given for her termination was pretextual.

63. In fact, Plaintiff was terminated after it became clear that his disability would impact his ability to work in the office even though Plaintiff could easily meet the requirements of his job from home with a setup that would allow him to continue working with minimal interruption.

64. Plaintiff was terminated in violation of the ADA.

## COUNT I

**VIOLATION OF ADA AGAINST DEFENDANT RAS AND DEFENDANT GDG FOR FAILING TO MAKE A REASONABLE ACCOMMODAATION AND FOR REFUSING TO ENGAGE IN THE INTERACTIVE PROCESS**

65. Plaintiff incorporates by reference each and every preceding paragraph of this Complaint.

66. Plaintiff has a disability as defined by the ADA.

67. As detailed above, Defendants were on notice of Plaintiff's disability.

68. Plaintiff never received the workplace accommodations he requested.

69. Defendants did not enter into the interactive process of exploring reasonable accommodations in good faith.

70. Defendants GDG and RAS discharged Plaintiff from his joint employment, when RAS, which controlled the terms and conditions of Plaintiff's employment, including specifically the decision to deny a reasonable accommodation and the decision to discharge Plaintiff, made those decisions.

71. Defendants' actions violated the ADA.

72. As a direct and proximate result of Defendants' intentional discrimination, Plaintiff has suffered damages, including but not limited to lost pay, job benefits, emotional distress, and all other damages allowed by law.

## COUNT II

### RETALIATION AGAINST DEFENDANT RAS AND DEFENDANT GDG

73. Plaintiff hereby incorporates each and every preceding paragraph as if set forth fully herein.

74. Plaintiff engaged in protected activity under the ADA by requesting the reasonable accommodation of being able to work from home on the days that his disability was aggravated.

75. In response, Defendants retaliated against Plaintiff.

76. Specifically, Plaintiff was retaliated against when he was discharged from employment.

77. Defendants' actions constitute unlawful retaliation in violation of the ADA, as amended.

78. Defendants willfully and wantonly disregarded Plaintiff's rights and Defendants' retaliation against Plaintiff was undertaken intentionally and in bad faith.

79. As a result of Defendants' unlawful actions, Plaintiff has suffered lost compensation and other benefits of employment, significantly diminished employment opportunities, emotional distress consisting of, but not limited to, outrage, shock, and humiliation, inconvenience, loss of income, and other indignities.

   WHEREFORE, Plaintiff demands a trial by jury and for the following relief:

   (a) a declaratory judgment that Defendants have engaged in unlawful employment practices in violation of the ADA;

   (b) an injunction prohibiting Defendants from engaging in unlawful employment practices in violation of the ADA;

(c)    full back pay from the date of Plaintiff's termination, taking into account all raises to which Plaintiff would have been entitled but for her unlawful termination, and all fringe and pension benefits of employment, with prejudgment interest thereon;

(d)    front pay to compensate Plaintiff for lost future wages, benefits, and pension;

(e)    compensatory damages, in an amount to be determined by the enlightened conscience of the jury, for Plaintiff's emotional distress, suffering, inconvenience, mental anguish, loss of enjoyment of life and special damages;

(f)    punitive damages in an amount to be determined by the enlightened conscious of the jury to be sufficient to punish Defendants for their conduct toward Plaintiff and deter them from similar conduct in the future;

(g)    reasonable attorney's fees and costs; and

(h)    nominal damages and any other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of August, 2025.

/s/ J. Stephen Mixon

- 14 -

        J. Stephen Mixon
        Georgia Bar No. 514050
        Attorney for Plaintiff
        THE MIXON LAW FIRM
        3344 Peachtree Street, Suite 800
        Atlanta, Georgia 30326
        Phone: 770-955-0100
        steve@mixon-law.com

        /s/Clifford M. Weiss
        Clifford M. Weiss
        Georgia Bar No. 746473
        Attorney for Plaintiff
        Fox and Weiss, P.A.
        3340 Peachtree Rd., Suite 1800
        Atlanta, Georgia 30326
        Phone: 770-317-1767
        cmweiss@foxweiss.com